IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID READY               :
       Appellant,      :
                    :
    v.               :      CIVIL NO. L-05-3358
                   :      CIVIL NO. L-05-3398
                    :
DAVID RICE               :
       Appellee.       :

## MEMORANDUM

Now pending is Trustee David E. Rice's Motion to Dismiss David Ready's Bankruptcy Appeal.  (Civil No. 05-3358, Docket No. 10).  For the following reasons and by separate order the Court GRANTS the motion and DISMISSES the appeal as MOOT.[1]

## I.    Introduction

The present motion and the underlying appeal concern the bankruptcy sale of an apartment complex in Baltimore called Mt. Pleasant, which was formerly owned by debtor OR Partners ("OR").[2]  Appellee David E. Rice was appointed OR's Chapter 11 trustee.  Early on, Rice concluded that it was in the best interests of OR's creditors to sell Mt. Pleasant.  Throughout October and into November 2005, Rice arranged for the property to be marketed and then auctioned, where it fetched $4.75 million on December 21, 2005.  Mr. David Ready, a former owner of OR, contends that the process by which Rice conducted the auction was

---

[1]     The present appeal comprises two civil action file numbers.  Ready's Emergency Motion for Stay Pending Appeal was docketed as Civil No. 05-3358.  Ready's bankruptcy appeal was docketed as Civil No. 05-3398.  By separate Order the Court consolidates both cases and dismisses them pursuant to 11 U.S.C. § 363(m) (West 2006).

[2]     Actually, Mt. Pleasant was marketed and auctioned with a companion property, Taney Manor, which is not the subject of this present appeal.  That Ready does not contest that Taney's sale price was inadequate is additional proof that the trustee's actions, and the Bankruptcy Court's decision, were in all respects adequate.

imperfect, and that the sale price is unreliable as an accurate measure of Mt. Pleasant's value.

Even if this Court were inclined to agree with Ready, which it is not, § 363(m) of the Bankruptcy

Code restricts appellate review to answering whether Mt. Pleasant was sold "for value."  On this

narrow issue Ready cannot succeed.

**II      Background**

      **A.     <u>Factual Background</u>:**

Ready's appeal arises from the bankruptcy of OR Partners, a real estate venture formerly

headed by Ready and Mr. Joseph O'Neill.[3]  In June 2000, to secure financing to purchase Mt.

Pleasant, Ready and O'Neill personally guaranteed several million dollars of loans extended to

OR by the Baltimore Community Development Financing Company (BCDFC).[4]  In March 2003,

Ready and O'Neill parted ways when O'Neill repurchased Ready's ownership interest.  This had

perhaps the unintended consequence of making Ready a creditor of OR, and so on April 7, 2004,

when presumably Ready determined that OR could no longer pay its debts, Ready filed an

involuntary bankruptcy petition.

---

[3]      <u>See</u> Transcript of Hearing of Chapter 11 Trustee's Motion for Entry of an Order (I) Authorizing the Sale of Real Property of the Estate Free and Clear of All Liens, (II) Approving Contract of Sale and (III) Approving the Assumption and Assignment of Certain Unexpired Leases in Connection with Such Sale, at 126-28.  (Held November 18, 2005.) [Hereinafter "Transcript."]

[4]      The urgency of Ready's appeal arises out of the fact that Mt. Pleasant's sale did not fully satisfy OR's obligation to BCDFC, and for which Ready remains liable.  Although Mt. Pleasant was sold for $4.75 million, after transfer taxes, payment of back property taxes, unpaid utility bills, closing costs, and Coldwell Banker's and the trustee's commissions and fees, OR could not fully repay the loan.  According to Ready, the amount for which Ready and former business partner Joseph O'Neill are personally liable is approximately $232,000.00.  <u>See</u> Opp. to Motion to Dismiss at 5.

On June 28, 2005, the Bankruptcy Court appointed Rice to serve as trustee.[5]  After inspecting the properties, poring over OR's financial records, and hiring an accountant to conduct his own independent examination, Rice issued his report on August 12, 2005.[6]  In it, Rice explained that Mt. Pleasant was in arrears, cash-starved, uninsured, and facing significant expenses stemming from mismanagement.[7]  Rice concluded that the best course of action was for Mt. Pleasant to be sold "without further delay."[8]

Rice proposed an auction of the property, with Coldwell Banker ("Coldwell") to serve as broker.[9]  On October 5, 2005, Rice formally requested the Bankruptcy Court to authorize the auction's procedures that he proposed.  No one – including Ready – challenged the procedures, which the Bankruptcy Court eventually adopted on November 9, 2005.[10]

Coldwell marketed Mt. Pleasant on the internet and in newspapers (The Daily Record, The Baltimore Sun, and The Washington Post), and by directly soliciting contacts within the real estate industry.[11]  Coldwell mailed interested buyers an "offering package" consisting of bidding

---

[5]     See Consent Order Vacating Order Dismissing Case and Directing Appointment of Chapter 11 Trustee, at 2.  (Bankruptcy Ct. Docket No. 04-18625-SD.)

[6]     See Opp. to the Emergency Mot. for Stay, Ex. A (Trustee's Report dated August 12, 2005).  Rice hired the accountant because he believed, and the accountant confirmed, that Mt. Pleasant's financial documentation was inaccurate.

[7]     Id. at 3-5, 9-10.

[8]     Id. at 10; Transcript at 66, 163-64.

[9]     On August 24, 2005, the Bankruptcy Court authorized Rice to hire Coldwell Banker as broker for the auction.

[10]     The Court approved the procedures on November 9, 2005.

[11]     Transcript at 95; 106; see 92-102 (describing Coldwell's marketing efforts).

procedures, a form contract, "and any other data that [Coldwell] had – plats, rent rolls, tax records, anything that [Coldwell] could get [their] hands on that was reliable data."[12] Prospective bidders had until October 26, 2005 to submit "stalking horse" bids, which would serve as a baseline for subsequent bidders.  Coldwell received six such bids, and Rice selected a stalking horse of $4.6 million.[13]

Following the stalking horse's selection, final bidding commenced.  Bidders had until November 18, 2005 to outrun the stalking horse.  Springwood Holdings, LLC ("Springwood") placed first with a $4.75 million bid.

**B.**       **The November 18, 2005 Sale Hearing and Subsequent Procedural History**:

Springwood's winning bid was the subject of the Bankruptcy Court's November 18, 2005 sale hearing.  At the hearing, and for the first time, Ready challenged the auction procedures. Ready alleged that Rice had provided too little financial information for prospective bidders to make an accurate appraisal of Mt. Pleasant's worth.  According to Ready, more information would have meant higher bidding - leading to a purchase price as high, or higher, than Mt. Pleasant's scheduled value of $6 million.[14]

To support his claim, Ready called as a witness Seymour "Sy" Zuckerman of Vanguard

---

[12]       Transcript at 96 (Testimony of Rene J. Gunning, Real Estate Broker for Coldwell Banker).  Coldwell sent out approximately forty-eight such packets for the Mt. Pleasant property. Id. at 97.

[13]       The stalking horse was submitted by Tracks, Inc., Springwood, LLC's parent company.  Id. at 99.

[14]       Id. at 75-76; see 149-50 (Closing Argument of Jeffrey M. Orenstein, counsel for David Ready).

Realty Group, a sometimes suitor of the property.[15]  At the sale hearing, Zuckerman expressed

his dissatisfaction with the amount of information available to potential bidders.  Zuckerman

insisted that because the bidding packages lacked the property's financial history, bidders and

potential bidders such as himself could not maximize their bids.

Bankruptcy Court Judge Stephen Derby disagreed, ruling that the sale price was fair and

reasonable, and that the auction had been professionally conducted.[16]  Judge Derby also rejected

Ready's assertion that the sale had taken place in an informational vacuum.[17]  The competitive

bidding process had fairly established the property's worth, the Bankruptcy Court stated.[18]

Moreover, due to sloppy record keeping, the exhaustive financial record that Ready desired

likely did not exist, nor could practically be reconstructed.[19]  In sum, Judge Derby, convinced

---

[15]     See id. at 117-24; Opp. to Mot. to Dismiss at 4.  Ready characterizes Zuckerman
as a thwarted white knight, but Zuckerman's actual role is more ambiguous.  In December 2004,
Zuckerman did submit a letter of intent to purchase Mt. Pleasant, and did petition Coldwell for
additional financial information about Mt. Pleasant.  From the record, however, it appears that
Coldwell never considered Zuckerman a qualified bidder.  Transcript at 106-08.  Zuckerman
submitted a non-conforming bid that, among other things, insisted on a "study period," during
which Zuckerman could back out of the sale, and a settlement date that ran past Coldwell's
stated closing date.  Id.  Moreover, Zuckerman was never tendered as an expert in commercial
real estate auctions, meaning that his opinions carry little weight.

[16]     See id. at 159-60; 163-165.  In its ruling, the Bankruptcy Court observed that it
had approved the bidding procedures, that Coldwell - a professional real estate company - had
entrusted the job to a commercial real estate broker, that the broker had advertised the property,
introduced the property to reputable buyers, and then generated bidding between the buyers
through the stalking horse process.  Id. at 164.  The Court further observed that the broker had
required substantial earnest money deposits from the bidders, which had the effect of
encouraging serious bidders only.  Id. at 160.

[17]     Id. at 156-60; 163-65.

[18]     Id.

[19]     Id. at 156-58.

that the auction "was not unreasonable in any way," approved the $4.75 million purchase price.[20]

In response, Ready moved for Reconsideration, which Judge Derby denied on December 1, 2005. Ready then filed for an Emergency Stay, which Derby denied on December 6. Having exhausted his options with the Bankruptcy Court, Ready then filed for an Emergency Stay with this Court. (Civil No. 05-3358, Docket No. 1). After hearing oral argument, this Court denied Ready's Motion on December 20. The same day, Ready noted the instant bankruptcy appeal. (Civil No. 05-3358, Docket No. 10).

## III.   Standard

Whether the Bankruptcy Court correctly approved Mt. Pleasant's sale is a question of fact.[21] This Court reviews findings of fact for clear error.[22] Clear error is found "when the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.'"[23]

## IV   Analysis

Once a bankruptcy sale pursuant to 11 U.S.C. § 363(a) or (b) has been consummated, § 363(m) of the Bankruptcy Code limits appellate review to the narrow issue of whether the sale was made to a "good faith purchaser."[24] If the Court finds that the property was sold to a good

---

[20]   Id. at 165.

[21]   See, e.g., Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

[22]   Id.

[23]   In re Broyles, 55 F.3d 980, 983 (4th Cir. 1995).

[24]   Section 363(m) of the Bankruptcy Code provides: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the

faith purchaser, then the Court goes no further than dismissing the appeal as moot.  Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).   Bankruptcy's mootness rule "protects the reasonable expectations of good faith third-party purchasers by preventing the overturning of a completed sale, absent a stay, and it safeguards the finality of the bankruptcy sale."  In re Trism, Inc., 328 F.3d 1003, 1006 (8th Cir. 2003).

The Bankruptcy Code does not define "good faith purchaser."  The Fourth Circuit, however, has adopted the term's traditional definition: "One who purchased the assets for value, in good faith, and without notice of adverse claims."  Willemain, 764 F.3d at 1023.

Ready's sole argument is that Springwood did not purchase Mt. Pleasant "for value."  Our Circuit has held that a reliable measure of "for value" is 75 percent of an asset's appraisal value.  Chemil v. Rulisa Operating Co. (In re Tudor Assoc., Ltd.), 20 F.3d 115, 199 (4th Cir 1994); Willemain, 764 F.3d at 1023.  When a property has not been appraised, a properly conducted auction may properly substitute for an appraisal.  See, e.g., In re Abbott Dairies of Pennsylvania, 788 F.2d 143, 149 (3d Cir. 1986) ("Generally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt.").

Under any standard, Springwood was a good faith purchaser of Mt. Pleasant.  Using Mt. Pleasant's Scheduled Value of $6 million, which is the value that Ready has always proposed, the $4.75 million sale price passes the traditional "for value" test.  Four and three-quarters of a million dollars is more than 75 percent of $6 million.  Indeed, it is nearly 80 percent.  By that

---

pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."  11 U.S.C. § 363(m) (West 2006).

measure, it is, as a number of witnesses testified at the sale hearing, a fair and reasonable price.[25]
Accordingly, it was not error for the Bankruptcy Court to approve it.

The auction procedures were also entirely reasonable.  The trustee hired a reputable real
estate broker who advertised the property and solicited reputable buyers.  Throughout October
and November 2005, the broker successfully marketed the property to approximately forty-eight
potential purchasers, generated six stalking horse bids, reopened bidding to the forty-eight
potential purchasers, and then ultimately secured the property's sale for an additional quarter of a
million dollars above the stalking horse bid.  The trustee's auction, therefore, adequately exposed
the property to the marketplace and achieved a "for value" sale as contemplated by § 363(m).

Ready's principal argument, that the sale should have been suspended while more
financial information could be gathered and presented to prospective buyers, cannot withstand
scrutiny.  As the trustee testified, and as the Bankruptcy Court concluded, Mt. Pleasant's fast-
deteriorating condition called for a prompt sale.[26]  Moreover, given Mt. Pleasant's chaotic record
keeping, it is highly unlikely that a clearer financial portrait would have emerged within any

---

[25]     Curtis Campbell, of Wallace H. Campbell & Co., who the trustee appointed to
manage the property of an emergency basis, testified that, "[C]onsidering the condition of the
property," $4.4 million was a "good price."  Transcript at 40.  David Rice, the trustee, testified
that the sale price was "the best achievable under the circumstances."  Id. at 73.  R. Dennis
German, a Coldwell Banker commercial real estate broker, stated that the bids received for Mt.
Pleasant "exceeded [his] expectations" and that higher prices could not have been obtained
during a longer marketing period.  Id. at 109.  Ready produced no evidence, save the Bankruptcy
Schedules, that Mt. Pleasant was worth more than the purchase price.

[26]     At the sale hearing's conclusion, the Bankruptcy Court observed that the trustee
and the real estate broker "were dealing with a situation where they were attempting to dispose
of [Mt. Pleasant] on a relatively short time line...not unreasonable when he had all of these
leaking roofs and water problems and damaged vehicles and all of that needed real attention, all
of this delayed deferred maintenance, trouble maintaining the insurance, and we have a situation
where they went ahead and did what was a reasonable promotion."  Id. at 164.

reasonable time from a forensic accounting.  Rice, the trustee, opined that it could not be done.[27]

Ready has presented no concrete evidence that forensic reconstruction was either practical or

would have provided information that would have spurred a reasonable bidder to go beyond the

$4.75 million sale price.  In the final analysis, then, Ready's argument falls into the category of

unsubstantiated criticism.

## V.      Conclusion

For the foregoing reasons and by separate Order the Court GRANTS Rice's Motion and

DISMISSES Ready's appeal as MOOT.  (Docket No. 10).


This 26th day of September 2006.


/s/

_____

Benson Everett Legg
United States District Judge

---

[27]      At this Court's Emergency Motion for Stay hearing, counsel for trustee Frederick
Carter echoed the Bankruptcy Court's reasoning when he argued that hiring a forensic
accountant would cause significant delay, and that there could be no guarantee that the
accountant could recreate a coherent financial picture given the limited information available.